agency 7 et al. We'll begin with oral argument on behalf of the appellant, Mr. Burnett. Good morning, everyone. We're here today for oral arguments. We will begin with appeal 25-2532, Becky Spengler v. Cooperative Educational Service Agency 7 et al. We'll begin with oral argument on behalf of the appellant, Mr. Burnett. May it please the court, this is a factually complicated case but a simple legal issue. The court is being asked to decide whether Becky Spengler was the subject of race discrimination when she lost her job because she would not change her beliefs about DEI, what the district court called critical race theory, or confess to being a racist for no other reason because she was white. I believe it's probably prudent to discuss four issues if time allows. The first two are the reasons we failed, we lost at the district court. The first reason we lost at the district court is the district judge found that no discrimination had occurred. I would note that the district judge is a well-respected jurist, a very thoughtful judge, and he concluded that the department, DPI, would require the same thing of both races and therefore no discrimination has happened. The judge concluded this based on largely a hypothesis that if Thomas Sowell, the well-known Nobel Prize winning African American economist, had been in Becky Spengler's position and refused the same things that Becky Spengler refused to do, he too would have been fired. The response to that is simply that it's a false analogy because what Thomas Sowell would have been asked to do was very different than what Becky Spengler was asked to do. Thomas Sowell, Becky Spengler was asked to confess that she was a racist because she was white. Thomas Sowell would have been asked to confess that Becky Spengler is a racist because she is white. Becky Spengler was asked to confess that she was a member of a race that oppressed other races. Thomas Sowell would have been asked to confess that Becky Spengler is a member of a race that oppresses other races. Mr. Burnett, if we were to take the appellate briefs version of the Sowell analogy, so not Judge Griesbach's but the appellate version, and play that down the board, would that result in a disparate treatment claim or a disparate impact claim? This is a disparate treatment claim. And what I'm wondering is if we hold to that analogy, again, not the one Judge Griesbach used in his decision but the one offered in the appellate brief, if the consequence of that would actually be a disparate impact claim versus a disparate treatment claim. It could be, but we didn't have the evidence to bring a disparate impact claim because all the coaches in Becky Spengler's position were white and there was no comparator. Judge Griesbach's analogy really fails for this reason. In order for there to be actionable discrimination, one must have been the subject of an adverse employment action because of their race. Thomas Sowell's race has nothing to do with his discharge. Becky Spengler's race has everything to do with her discharge. Now, that's not to say that Thomas Sowell's firing wouldn't be actionable under Title VII but a different area of the statute. If Sowell opposed the thinking strongly enough, he may well have had a retaliation claim. But he doesn't have a discrimination claim because it is not his race that has motivated the adverse employment action. Does that answer your question, Your Honor? Thank you. The second reason the district court found we lost was the court concluded that there is no evidence that a reasonable jury could believe that the Department and CESA 7 required of Becky Spengler that she abandoned her beliefs on race or confessed to being a racist. Now, this court reviews that issue de novo and of course summary judgment standards are well known, well settled. If there's a genuine issue of material fact or if there's any inference arising from those facts that favor the plaintiff, the decision belongs to a jury, not a judge. And there are five categories of facts that I think the district court overlooked. The first begins with what's been referred to in the briefs is the CCPP. It's basically a practice manual that tells people like Becky Spengler how to do their job. And that manual requires that Becky Spengler and coaches in her position hold what the book refers to as an equity mindset. The answers to interrogatories that we received in this case said one of the reasons Becky Spengler was not particularly suitable for this job is she lacked an equity mindset. So what is an equity mindset? Well, a mindset is simply a system of beliefs. And what is an equity mindset? It is a belief in DPI's philosophy. The district court described that aptly. The district court said, wrote, quote, what plaintiff refers to as DPI's racist ideology is the theory known as critical race theory, which holds that racial disparity in areas of life, including income, employment, wealth, and it goes on, is evidence of racism. Critical race theory views such disparity as the result of systemic racism, white privilege, and white supremacy, which theory holds, which the theory holds are endemic in American culture. So the question is, does the CCPP require Becky Spengler to do so? Well, under the heading equity mindset, which is found in the supplemental appendix filed with this court, an unacceptable variation, an employee who doesn't do their job, is a coach, is unwilling and or unable to see or speak to how their power and privilege, their power and privilege are at work to systematically advantage some and systematically disadvantage others. Mr. Burnett, can I ask you a question on this whole line of argument? Certainly. When you, when I go through all of the various evidence that you have presented on this, what Ms. Spengler believes is the best content or definition of equity mindset, to my eye, a lot of it is actually race neutral. Okay, now I know you're going to disagree with that and I want to hear your pushback on it. Because when you start talking about things like people in positions of authority in the educational space or people that were born into privilege, that sure seems to me it can be race neutral. It doesn't necessarily mean you're white. And so all I'm, I know, I know that, I know that you're very clear on this in your brief, that the equity mindset and the affirmation that was required of your client was, you know, to agree with the proposition that whites and only white people are born racist. I mean, you're crystal clear on that. But the question I have is, what's the best evidence you have that that's actually what she was required to, you know, swear to or agree with? Well, that tailors into the other four categories, but let me give you a direct answer to your question. To the extent it pertains to what I'll call the manual. Yeah, fair enough. The manual only addresses white. It defines whiteness but nothing else. Defines white privilege but nothing else. Defines white power but nothing else. But do, but anywhere does it say that that non-white people are born free of all of this? No, it doesn't describe, it doesn't discuss the subject at all. It is a reasonable inference for a jury to read this manual and conclude this is, this is about the white race because the manual talks about oppressing other races. And of course, if it's race neutral, there is no such thing as oppressing other races. The other evidence of what did the department require of Becky Spangler is found in the deposition testimony and particularly the emails that these superintendents, the directors of these programs sent about Becky Spangler. When she began to speak out, she was actually quite critical and quite vocal of DPI's philosophy. And behind the scenes, there were emails that went back and forth to the extent that this is a problem. These views are not welcome. And they went so far as to call for her firing very early after she started to speak out. That is evidence that because she didn't espouse the DPI's philosophy that her employment was in jeopardy. They sent a new contract over. Before you return to that point, Mr. Burnett, this kind of dovetails into your First Amendment argument. Can you hear me okay? And your brief seems to challenge only the district court's conclusion that you didn't adequately plead claims about what Ms. Spangler believed or didn't believe or refused to believe. Is that the only aspect of the First Amendment claim you're challenging? Are you waiving other aspects of your First Amendment claims? Well, I didn't see an argument that somehow or other there wasn't a First Amendment claim here as a matter of law. I didn't see an argument that said you're outside the rule of law. The argument was not even that claims about speech were out of bounds. The argument was is that we didn't understand that you claimed that your beliefs were oppressed and consequently we have a 1983, we don't have a 1983 claim. If you go to paragraph 37 of the Second Amendment complaint, there's a series of allegations mentioned in both the brief and the reply brief, in our brief, setting forth half a dozen episodes, instances where beliefs are pled. In addition, there is a, you're probably going to think I've got to get outside interest, but there's a great opinion from the Seventh Circuit that we quoted in the brief, Doe v. Smith. And Doe v. Smith says you need to plead claims for relief. Not facts, not law, not causes of action. That stuff went out with code pleading. All you need to do is give the defense an idea as to why they're being sued. Doe v. Smith expresses pleading principles no better than anywhere else that I've ever read. Mr. Burnett, if we were to agree with you on the First Amendment retaliation and vacate and remand on that particular claim, what would happen on remand? How would it make a difference? Might the district court simply reaffirm that Spangler spoke pursuant to her job duties rather than as a private citizen and that claim would go away? That may well be what the district court does. DPI goes away because a 1983 claim can't stand against the state, so it's just Spangler v. CESA 7. And there will probably be a renewed round of summary judgment motions challenging the substance of the First Amendment claim rather than the procedure. What's your view of the scope of the First Amendment issue before us? It's kind of what Judge Jackson and Kimme was getting at. What do you think is before us on appeal with respect to the First Amendment? What's before you on the First Amendment issue is whether the claim for oppression of Becky Spangler's right to believe was adequately pled. Anything involving speech? Are those two just so inextricably connected that it's just the flip side of the coin? Yeah. Belief is really the same as refusal to speak. And the essence of that claim is that under the First Amendment, the government can't force people to believe. So before us on appeal is the whole. There's nothing left out in your view on a First Amendment claim. It's speech. It's belief. It's discrimination. It's retaliation. It's all of the above. Yes. Speech and belief are the subject of the First Amendment claim. Would you like to reserve the remainder of your time? If I could, Your Honor. Yes. Thank you, Mr. Burnett. Ms. Bockhuber will now move to you for oral argument on behalf of one of the applicants. Good morning, Your Honors, and may it please the Court. I am Assistant Attorney General Rachel Bockhuber from the Wisconsin Department of Justice, and I represent the Wisconsin Department of Public Instruction. Today I intend to address the Title VII claims, and Counsel for the Co-Appelee will be addressing the forfeiture issues and constitutional claims against CESA 7. The district court's judgment should be affirmed because Title VII does not reach the conduct Ms. Spengler challenges and because the department is not her indirect employer. Before we get into the race discrimination, I wanted to clarify a few issues. Federal law requires the department to collect data and identify racial achievement gaps as well as significant racial disproportionality in special education identification and discipline. Once identified, school districts must complete a robust, continuous improvement process to exit those categories. The department's coaching initiatives satisfies that process. The department implemented the two projects to comply with federal statutory obligations, advance educational policy goals, and improve outcomes for students with disabilities. Under the contract between the department and CESA 7, Ms. Spengler's role was to serve as an ambassador for these projects and to communicate the project information to the districts in a manner consistent with the department's messaging. And on that point, the department is entitled to speak for itself and when the department is speaking, it may choose its messaging and promote its own policy viewpoints. And so whatever one thinks about those policy viewpoints or messaging or the two projects, Title VII asks whether the department took adverse action against Ms. Spengler because she is white. It did not. Ms. Spengler has clarified that she is raising a claim of disparate treatment. Title VII prohibits employers from taking adverse action against an individual because of such individual's race. Here, Ms. Spengler was subject to the same expectations as all the other project participants. The department here sought her reassignment from the projects after she publicly attacked the work as anti-racism BS, accused participants of incriminating themselves, and eroded trust within the two statewide projects. After the September 15th chat message, the department reasonably concluded that it could not trust her to effectively serve as an ambassador for these projects and carry out its messaging. In Rust v. Sullivan and again in Rosenberg, the Supreme Court recognized that when the government enlists a contractor to convey its own message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the contractor. That is not race discrimination. Race-conscious messaging or talking about race is not the same as racially disparate treatment. Title VII asks whether the department acted against Ms. Spengler because she is white. The record here says no. First, the record does not support that Ms. Spengler was compelled to confess that she is racist or denounce her race or accept personal blame for racial inequities because she is white. The department's publications that Ms. Spengler cites in her briefing that were briefly discussed earlier were part of its effort to address racial achievement gaps and significant racial disproportionality in special education identification. The materials are not accusatory toward any individual, nor do they use race as a negative. For example, in the model to inform culturally responsive practices, one of the eight steps is to understand that we have unique identities and worldviews, and it specifically states that we use cultural precepts as frames of reference, not as stereotypes or predictors of what individual families or students know, do, or believe. It recognizes that each of us is a complex and dynamic blend of cultures and roles with vastly individual differences. The coaching competency practice profile is a tool that defines coaching so that it's teachable, usable, learnable, and doable in educational settings. And the equity mindset component is just one of seven components, and that component is the only one that references whiteness or white supremacy. And even in that context, it discusses the history of whiteness on systems. It does not refer to it in the present tense, and it is not accusatory toward any individual. One of the other components is the relationship development component, and that one is all about honoring the expertise and experiences of all. As far as the third-party publications that were cited in Ms. Spengler's brief, those were used to facilitate discussions at training meetings. They were not used as directives that required Ms. Spengler's agreement. The language in the 2022-23 integrated contract, that language applied equally to all project participants, regardless of race, and required all to have a demonstrated commitment to examining their personal biases. Assistant State Superintendent Paul Manriquez testified that examining is the key word there. No one is excluded from the projects because they do not believe that they are biased. Second, as to Ms. Spengler's claim that the department required her to agree on matters of race, the district court appropriately looked at the September 15th meeting to answer that question. At the September 15th 2021 meeting, that's the meeting that Ms. Spengler sent the chat message that said, I got them to say I can't do this work if I don't believe in all this anti-racism BS. The district court looked at the video and the transcript of that meeting and saw that that was not what happened. The transcript before the message shows that Ms. Spengler repeatedly questioned the facilitators whether someone could do the work if they did not believe in systemic racism. But the facilitators, Aaron Fasumali in particular, framed the issue as one of professional alignment with the project goals, not as a compelled personal belief. And she used a curriculum analogy. If a teacher fundamentally disagrees with the curriculum, the teacher may need to consider whether the position is the right fit for them. Can I ask you a question about that in the context of the First Amendment claim? Hypothetically, suppose that I'm a public school teacher, a science teacher, award winning, and the curriculum requires that we teach evolution. And I teach it and I do a very good job with it. But in a discussion with the principal, I reveal I actually don't believe in evolution. And I'm fired. Okay, but there's no question that I teach it, I teach it well. And I say to the principal, hold on, the reason I teach evolution so well is I know it very well. I've studied it very well. As part of coming to my own view that I disagree with it. Would I have a First Amendment claim? So the First Amendment claim, my co-applicant will be addressing the First Amendment claim. Yeah, it's not race. Right. But you are kind of getting it like compelled belief.  I teach the curriculum because I can't control the curriculum. The curriculum is set by the state. So I don't think that it would necessarily control a person's personal beliefs. I think a person can teach a subject regardless of whether they believe in it or not. Right, so if they're fired for their personal belief, do they have a claim or don't they? They were willing to continue to teach on the subject? They have for years. Past, present, future. So I haven't studied that First Amendment issue. Maybe I'll save it for your colleague. Thank you. But I mean the broader legal question is does the First Amendment, does it protect? There's all kinds of these associational cases and political patronage. I know that. But is it just a pure matter of First Amendment law? Does it protect personal belief? Does the First Amendment protect? Yeah, that's your colleague can think about it. Okay. Although, where it dovetails with the argument you're presenting to us this morning on behalf of DPI is that she was fired for none of these things, but as you said to us this morning, undermining, seeking to attack, I can't replicate the exact words that you used, but it was the behaviors coming out of the September 15th meeting. Is that my understanding of your argument? Yes, that's correct. It was the conduct, her conduct at the meeting on September 15th that eroded trust within the statewide projects. And there were multiple complaints afterward, not just from the department employees who were at these meetings, but from her colleagues at other CISA agencies. There were at least three emails and there were three survey responses that expressed exhaustion, expressed concern about whether they were even going to be able to move forward with the work, and expressed concern about her suggestion that she was sharing externally the internal recordings of the meetings. And so back to the 2022-23 contract language, the key word there is examining, that no one's excluded because of bias. Third, Ms. Spangler was subject to the same expectations as everyone else. The department expected all coaches to work with school districts to help special education teams make good decisions when identifying and supporting students with disabilities. That meant that they were to help districts identify patterns in their data, think through difficult cases, and examine, examining as the key word, whether bias or inconsistent practices might be impacting student outcomes. Ms. Bachuber, there's the sole analogy in the district court opinion. Then there's the sole analogy prime that's been offered in the appellate brief from Ms. Spangler's counsel. And then they join that with this Muldrow case. Muldrow has statements with regard to what is discrimination. As I understand the argument, they're arguing under Muldrow the policy would treat white people worse than black people because it requires them to make a more damning confession. What is your response to that? So there was no compelled confession to begin with. So I think that the premise fails in that analogy. And secondly, the contract language is race neutral. It requires participants to have a demonstrated commitment to examining their personal biases. So that's not personal biases of whiteness being racist or personal biases of a different race being racist. It's everyone is required to examine their personal biases. And so it's a neutral rule that everyone was required to have a commitment to, to just examining these things. No one's excluded if they ultimately determine after examining that they have no biases. So that's a leap that the record here does not support. And in the end, Ms. Spangler was replaced by another white woman after she was reassigned off the project. So that cuts against any inference that the department or CESA 7 wanted her gone because she is white. In Bowman v. City of Chicago Board of Education, which is an unpublished case, but it was in September of 2025, and I believe Judge Scudder was on that panel, this court recognized that under Muldrow, working conditions that are broadly applicable to multiple employees rather than unique to the individual do not support a claim of individualized mistreatment. Here there's no evidence the department acted because Ms. Spangler is white rather than because of the conflict surrounding her conduct in the project. And then turning to the retaliation claim briefly, Ms. Spangler has not shown she engaged in a statutorily protected activity. Under Title VII, Title VII protects opposition to unlawful employment discrimination on the basis of race, sex, ethnicity, color, or religion. It does not protect disagreement with educational philosophy or political ideas. Here Ms. Spangler never opposed racially discriminatory hiring, firing, compensation, benefits, or allocation of vacation time. She did not oppose an unlawful employment action. The September 15th chat message was not a protected activity. That message did not allege race discrimination, reference an illegal employment action, or connect any conduct to discriminatory treatment on the basis of race. And Ms. Spangler herself acknowledged that that message violated the group's agreed-upon norms regarding trust, relationship building, and respectful conversations. CESA, we have a limited time left. I just want to ask about DPI being an indirect employer. Yes. Because CESA very clearly says, you know, we moved her out of the position because we were told there was going to be some defunding. And then you've got DPI providing training materials, influence, direction, and this kind of funding, what Spangler characterizes as a funding threat, a threat of withdrawal. So how does that not make DPI an indirect employer here? So I would analogize this situation to the Love case. And in that case, the contractor threatened to cancel the contract if the subcontractor's employee wasn't removed from the site. The contractor retained authority to decide who was allowed on the project site, and they kicked the subcontractor's employee off. There was discussions between the contractor and the subcontractor trying to get the employee back, the plaintiff, and the contractor ultimately threatened to cancel the contract. But the contractor did not attempt to meddle with the employee's future employment at the subcontracting agency. And that's exactly what happened here. The department never told CESA 7 that they had to fire Ms. Spangler or couldn't give her another job. And, indeed, she remained employed with CESA 7 afterward. My time is up. Thank you very much. Thank you, Ms. Bockhuber. Ms. Tierney, we'll move to you now for argument on behalf of CESA 7. Perhaps you could begin with Judge Scudder's hypothetical. Thank you. Good morning. May it please the Court, Danielle Tierney of Axley representing CESA 7. Judge, to answer your question, I don't have the law at my fingertips, nor was it briefed before this Court or the District Court. We didn't research or argue that because it was never pled. The personal belief first amendment claim. Assume we disagree with you on that, on what the adequacy of the pleading is in the Second Amendment amended complaint. In other words, just assume for purposes of the question that Ms. Spangler did adequately plead a compelled belief claim. Well, then, Judge, I would respectfully request, I would have to provide some supplementation at a later time. We didn't brief that, nor did I research that, because as we understood based on the appellant's arguments, that the sole argument here on appeal was we did plead that, and they're requesting that that claim be remanded to the District Court for further briefing. So, unfortunately, I don't have that available at my fingertips. Would your position, I understand that you say you want more time and ability to brief, but there's also a Garcetti question here. Is that something the District Court needs to return to on remand if we were to agree with Ms. Spangler on that point, or is that something we have the record here for? On whether she was speaking as a private citizen versus a public employee, that issue. On the speech issue? The speech issue, I think there is a sufficient record. However, she didn't argue the merits of that, so I believe you had requested or inquired as to whether or not, or what the scope of the First Amendment issue is on appeal. And on appeal, Ms. Spangler did not argue the merits of her speech or compelled speech claim. Rather, her sole issue on appeal as to the First Amendment is we adequately pled these other claims, and the District Court improperly ruled that we did not plead them. Yeah, I tend to think you might be right about that. As I read the briefs before us, the only thing that seems before us is the First Amendment belief claim. Maybe Mr. Burnett can correct me on that, but I just don't see Ms. Spangler really pressing the speech issue. I would agree with you on appeal. And the belief issue, I think she is, and I think you're right to say that in the first instance, you have to figure out whether the District Court properly concluded that she didn't adequately plead a belief claim.  Yeah, I don't want to repeat my question, but I'm interested in just assuming that that's incorrect. Does the First Amendment protect belief? So you could use my evolution hypothetical or a hundred others. And, Judge, respectfully, I don't have an answer for you on that. I apologize. In addition to the First Amendment issue, though, I do want to very briefly, because I know I have limited time, address the discrimination claim that's before the court. The Circuit Court should affirm the dismissal of the discrimination claim against CESA 7, and Ms. Spangler's attempts to recast her discrimination claim against CESA 7 on appeal should not be condoned. She never made this three-part or two-part or four-part, however she wants to recast it, argument of discrimination against CESA 7. Her new discrimination theory wasn't raised in response to the motion for summary judgment that CESA 7 filed. CESA 7 argued that Ms. Spangler could not establish the McDonnell Douglas claims of discrimination against her, and there was no merit to her argument that there was any kind of adverse action. In response to CESA 7's motion, Ms. Spangler argued that CESA 7 failed to protect Ms. Spangler from DPI's discrimination, which is not on appeal, she did not raise that issue, and that CESA 7 engaged in its own acts of discrimination in that there were fishy circumstances because this case was briefed prior to the Ames decision, that she was meeting her expectations and that she did not need a comparator. So she nested her response in the McDonnell Douglas. Her theory that she argued that she opposed DPI's unlawful discrimination, that was in her retaliation claim. She was saying that was a protected activity that she opposed and that CESA 7 retaliated against her. In her district court briefing on document 113, page 30 of the ECF filing, her two-part component theory is that DPI had this unlawful practice and procedure and that DPI insisted that everybody adhere to it. There was no argument that CESA 7 made that same requirement. So her attempts now to recast that argument are improper and she did not raise that issue. Thank you. Thank you, Ms. Tierney. Mr. Burnett, we'll go back to you now for rebuttal argument. Thank you, Your Honor. I should begin by correcting something that led the argument for DPI off. This case is not about who decides what message the public receives. Becky Spengler did her job and did it well in the field. DPI repeats here what it said in interrogatories and what it seemed to walk away from or state less in its briefing, and that is that Becky Spengler's meeting behavior was abysmal and it is that reason that DPI urged CESA 7 that she needed to go. These meetings were on videotape and after a lot of discovery motion practice, the district court required DPI to reveal just where on these tapes does she do this stuff? And we got a stack about that yay wide and after that we transcribed it and that's all in the record and this is what the district court said about that. The record supports plaintiff's claim that she, he's quoting us, never, underlining the word never, raised her voice, spoke disrespectfully, used profanity or sarcasm, ignored requests or directions of DPI or otherwise behaved unprofessionally toward DPI or any of her colleagues. That's a pretext. If they had a legitimate legal basis to insist on her discharge, why put forward a false one? It's akin to a criminal accused of a crime, someone accused of a crime trying to escape. This court addressed that pretext issue in Murphy versus Caterpillar Tractor. It said pretext does not require an inference on unlawful animus, but it does permit that inference. This principle means that when a plaintiff has offered evidence permitting a reasonable inference of pretext, summary judgment should be denied. It is that legal principle, as long as DPI is insisting that her behavior was abysmal at meetings, that entitles us to trial so a jury can reach that conclusion. DPI also says, yeah, but you've got to show more than just a pretext, you've got to show other evidence of discrimination. The same court, Murphy, held in St. Mary's Honor Center, that's a Supreme Court case, the Supreme Court made clear that a showing of pretext is sufficient to permit an inference of unlawful discrimination. The court also made clear that no additional proof of discrimination is required. And this court italicized the words required. So what we have here is we have two things going on. We're entitled to a trial based on DPI's excuse, which we can prove was objectively false. Second, we're entitled to a trial because there is ample evidence that Spengler was let go because of her beliefs about race. DPI's e-mails confirm that. They're behind the scenes urging for her firing supports that. The new contract they proposed supports that, this whole idea that somehow or other you need to examine your biases and if you have none, all's good, is not supported in the contract language they provided. In order to keep her job, Becky Spengler had to have a demonstrated commitment to examining personal biases in the areas of race. That assumes that she's biased. I see my time is up. Thank you, Mr. Burnett. Thank you, Ms. Bockhuber. Thank you, Ms. Tierney. The case will be taken under advisement.